ANTHONY M. BARNES, SBN 199048
Email: amb@atalawgroup.com
JASON R. FLANDERS, SBN 238007
Email: jrf@atalawgroup.com
JAMES T. BRETT, SBN 315820
Email: jtb@atalawgroup.com
AQUA TERRA AERIS (ATA) LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (917) 371-8293

*Attorneys for Plaintiffs*
CALIFORNIA COASTKEEPER, INC., dba
CALIFORNIA COASTKEEPER ALLIANCE,
THE OTTER PROJECT, INC., and
MONTEREY COASTKEEPER.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COASTKEEPER, INC., doing business as CALIFORNIA COASTKEEPER ALLIANCE, a nonprofit corporation, THE OTTER PROJECT, INC., a nonprofit corporation, and MONTEREY COASTKEEPER, a nonprofit corporation.<br><br>    Plaintiffs,<br><br>    vs.<br><br>SPRECKELS INDUSTRIAL PARK LLC, a California limited liability company, TANIMURA AND ANTLE FRESH FOODS INC., a California corporation,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

1    CALIFORNIA COASTKEEPER, INC., doing business as CALIFORNIA COASTKEEPER

2    ALLIANCE ("CCKA"), THE OTTER PROJECT, INC. ("TOP"), and MONTEREY

3    COASTKEEPER, (collectively, "Plaintiffs"), by and through their counsel of record, hereby allege

4    as follows:

5    **I.  <u>JURISDICTION AND VENUE</u>**

6    1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal

7    Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA").  (*See* 33

8    U.S.C. § 1365.)  This Court has subject matter jurisdiction over the parties and this action pursuant

9    to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive

10   relief arising under the Constitution and laws of the United States).

11   2.    On February 3, 2021, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Tanimura

12   and Antle Fresh Foods, Inc. and Spreckels Industrial Park LLC ("Defendants"), for the industrial

13   facility in Spreckels and Salinas, California, under its control.  The Notice Letter informed Defendants

14   of its violations of California's General Permit for Discharges of Storm Water Associated with

15   Industrial Activities (National Pollutant Discharge Elimination System (NPDES) General Permit No.

16   CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ), as

17   superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122–DWQ (hereinafter

18   referred to as the "Storm Water Permit), and the Clean Water Act at Defendants' facility located at121

19   Spreckels Blvd., and 1 Harris Rd., Salinas, California ("Facility"). The Notice Letter informed

20   Defendants of Plaintiffs' intent to file suit against Defendants to enforce the Storm Water Permit and

21   the Clean Water Act.

22   3.    The Notice Letter was sent to Defendants' Chief Executive Officer, Scott Grabau, and

23   Secretary and registered agent for service of process, Kerry L. Varney, as required by 40 C.F.R.

24   § 135.2(a)(2). The Notice Letter was also sent to the Administrator of the United States

25   Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive

26   Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of

27   the Central Coast Regional Water Quality Control Board ("Regional Board") as required by Section

28

1    505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).  The Notice Letter is attached hereto as Exhibit A

2    and is fully incorporated herein by reference.

3         4.    More than sixty (60) days have passed since the Notice Letter was served on the

4    Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege,

5    that neither the EPA nor the State of California has commenced or is diligently prosecuting an action

6    to redress the violations alleged in the Notice Letter and in this complaint. (See 33 U.S.C. §

7    1365(b)(1)(B).) This action is not barred by any prior administrative penalty under Section 309(g) of

8    the CWA, 33 U.S.C. § 1319(g).

9         5.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the

10   CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial

11   district.

12   **II. <u>INTRODUCTION</u>**

13        6.    With every rainfall event, hundreds of millions of gallons of polluted rainwater,

14   originating from industrial operations such as the Facility referenced herein, pour into storm drains

15   and local waterways. The consensus among regulatory agencies and water quality specialists is that

16   storm water pollution accounts for more than half of the total pollution entering marine and river

17   environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive

18   areas.  Although pollution and habitat destruction have drastically diminished once abundant and

19   varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as

20   macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment,

21   heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as,

22   high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms

23   the special aesthetic and recreational significance that the surface waters have for people in the

24   surrounding communities. The public's use of the surface waters exposes many people to toxic metals

25   and other contaminants in storm water and non-storm water discharges. Non-contact recreational and

26   aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the

27   Receiving Waters.

28

7.     This Complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' substantive and procedural violations of the Storm Water Permit and the CWA resulting from Defendants' operations at the Facility.

8.     Plaintiffs specifically allege violations regarding Defendants' discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

### III. PARTIES

#### A.  The Plaintiffs

9.     California Coastkeeper Alliance is a non-profit public benefit organization dedicated to protecting California's coasts and oceans. The Otter Project, Inc., is a non-profit public benefit organization working to protect our watersheds and coastal oceans for the benefit of California's Southern Sea Otters and humans through science-based policy and advocacy.  Monterey Coastkeeper is a non-profit public benefit organization and is a participant in the California Coastkeeper Alliance. These three organizations shall collectively be known as "The Plaintiffs." The members of these organizations reside in the communities adjacent to the Salinas River (the "Receiving Waters") into which the Defendants indirectly discharge polluted storm water.  As explained in detail below, the Defendants continuously discharge pollutants into the Receiving Waters, in violation of the Clean Water Act and the Storm Water Permit. The Plaintiffs' members picnic, fish, hike, bike, and enjoy the wildlife of the Salinas River and the estuary of the Monterey Bay.  Additionally, the members use the Receiving Waters to engage in scientific study through pollution and habitat monitoring to promote restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs the Plaintiffs' members' use and enjoyment of these waters. Thus, the interests of the members have been, are being, and will continue to be adversely affected by the Defendants' failure to comply with the Clean Water Act and the Storm Water Permit.

10.     Plaintiffs are dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, Plaintiffs

are actively seeking federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiating citizen enforcement. As referenced herein, members of Plaintiffs use and enjoy the Receiving Waters herein into which Defendants have caused, is causing, and will continue to cause, pollutants to be discharged.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiffs caused by Defendants' activities.

11.     Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendants' discharge of polluted stormwater and non-stormwater from the Facility, negatively impacts and impairs Plaintiffs' members' use and enjoyment of these waters.

12.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no plain, speedy, or adequate remedy at law.

### B.  The Defendants

13.     Plaintiffs are informed and believe, and thereon allege, that the Defendants are the owners and operators of the Facility located at 121 Spreckels Blvd., Spreckels, CA 93962 and 1 Harris Rd., Salinas, CA 93908.

14.     Plaintiffs are informed and believe, and thereon allege, that Defendant Tanimura and Antle Fresh Foods Inc.is an active California corporation, registered with the California Secretary of State as File Number C2934757 and that Defendant Spreckels Industrial Park LLC is a California limited liability company registered with the California Secretary of State as Entity Number 199727510021.

## IV. STATUTORY BACKGROUND

### A.     The Clean Water Act

15.     Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a

National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

16.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p).) States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342.)

17.    Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. (*See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).)

18.    The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. (33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).)

19.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." (33 U.S.C. § 1362(12); see 40 C.F.R. § 122.2.)

20.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C. § 1362(6); see 40 C.F.R. § 122.2.)

21.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." (33 U.S.C. § 1362(14); see 40 C.F.R. § 122.2.)

22.    "Navigable waters" means "the waters of the United States."  (33 U.S.C. 1362(7).)

23.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." (33 U.S.C. § 1362(7).)

24.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States."  (40 C.F.R. § 122.2.)  The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

25.     The CWA confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water.  (*See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).)

26.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters."  (*Id.,* at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.)

27.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling.  (*Id.,* at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.)

28.     Section 505(a)(1) and Section 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (See 33 U.S.C. §§ 1365(a)(i) and 1365(f).)

29.     The Defendants are "person[s]" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

30.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

31.     Pursuant to sections 309(d) and 505 of the CWA, each separate violation of the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects the violator to a penalty of up to $53,484 per day. (See 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4)(Adjustment of Civil Monetary Penalties for Inflation).)

32.     Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.  California's Storm Water Permit**

33.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.  States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. (*Id*.)

34.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006).) In California, the State Board is charged with regulating pollutants to protect California's water resources. (*See* Cal. Water Code § 13001.)

35.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA.  (Storm Water Permit, Section XXI(A).)

36.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States.  The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.   (*See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).)

37.     Under the applicable EPA regulations all surface and ground waters of the State of California are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards unless a strict use attainability analysis is performed based upon a structured scientific assessment of the factors affecting the attainment of uses

specified in Section 101(a)(2) of the CWA (the so called "fishable/swimmable" uses). (40 CFR 131.10(a) and (g).)

38.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

39.     On July 1, 2015, the operative Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). Storm Water Permit, Section I(A) (Finding 4). The Storm Water Permit superseded the 1997 Permit except for enforcement purposes. (*Id.*, at Section I(A) (Finding 6).) The substantive requirements of the Storm Water Permit are the same or more stringent than the requirements of 1997 Permit.

40.     On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Amendment").

41.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit.  (Storm Water Permit, Section I(A) (Findings 8, 12).)  Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board.  (*See* Storm Water Permit, Section I(A) (Finding 17), Section II(B).)

42.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (*See* 33 U.S.C. §§ 1365(a)(i), 1365(f).)

### C.  The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

43.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States.  (Storm Water Permit, Discharge Prohibition III(B).)

44.     Effluent Limitation V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.  Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

45.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

46.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution.  (33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).)  EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards.  (*See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

47.     The EPA established Parameter Benchmark Values for the following parameters, among many others: total suspended solids ("TSS") - 100 mg/L; oil & grease ("O&G") - 15 mg/L; total organic carbon ("TOC") - 110 mg/l; aluminum ("Al") - 0.75 mg/l; iron ("Fe") - 1 mg/l; copper ("Cu") - 0.0123 mg/l; zinc ("Zn") - 0.11 mg/L; pH - 6-9 s.u.; and nitrate & nitrite nitrogen ("N+N") - 0.68 mg/L. The Water Quality Control Plan for the Central Coastal Basin, which covers the region in

1    which the Facility is located, requires a narrower pH range of 7.0 – 8.5 for all inland surface waters,

2    enclosed bays and estuaries, marine habitat, cold freshwater habitat, and warm freshwater habitat, and

3    6.5 - 8.3 pH units for most beneficial uses including municipal and domestic supply, water contact

4    recreation, non-contact water recreation, and agricultural supply. The Storm Water Permit contains

5    Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark

6    Values. (Storm Water Permit, Section I(M) (Finding 62).)

7    48.    Receiving Water Limitation VI(B) of the Storm Water Permit prohibits storm water

8    discharges from adversely impacting human health or the environment. Further, discharges with

9    pollutant levels that exceed levels known to adversely impact aquatic species and the environment

10   are violations of the Storm Water Permit's Receiving Water Limitation.

11   49.    Receiving Water Limitation VI(A) of the Storm Water Permit prohibits storm water

12   discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a

13   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

14   50.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the

15   State Board, the various Regional Boards, and the EPA, to be protective of the beneficial uses of the

16   waters that receive polluted discharges.

17   51.    The State of California regulates water quality through the State Board and the nine

18   Regional Boards.  Each Regional Board maintains a separate Water Quality Control Plan which

19   contains WQS for water bodies within its geographic area.

20   52.    As referenced in ¶47, *supra*, the State Water Quality Control Board has issued the Water

21   Quality Control Plan for the Central Coastal Basin ("the Basin Plan") to establish water quality

22   objectives, implementation plans for point and non-point source discharges, prohibitions, and to

23   further statewide plans and policies. The Basin Plan states that "[a]ll waters shall be maintained free

24   of toxic substances in concentrations which are toxic to, or which produce detrimental physiological

25   responses in, human, plant, animal, or aquatic life." (Basin Plan, 3.3.2.1.) The Basin Plan sets forth

26   water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. (Basin Plan,

27   Tables 3-1 - 3-4.) The Basin Plan decrees that waters shall not contain chemical constituents,

28

1    discoloration, substances, or floating material in concentrations that cause nuisance or adversely

2    affect beneficial uses. (Basin Plan, 3.3.2.1.)

3         53.    In addition to the *de facto* beneficial uses of swimming and fishing applicable to the

4    Receiving Waters herein (*see* 40 CFR 131.10(a) and (g)), the Basin Plan also identifies present and

5    potential beneficial uses for various hydrologic units leading to the Salinas River Basin, with

6    municipal and domestic supply, agricultural supply, industrial process supply, industrial service

7    supply, groundwater recharge, fresh water replenishment, navigation, hydropower generation, water

8    contact recreation, non-contact water recreation, commercial and sport fishing, aquaculture, warm

9    fresh water habitat, cold fresh water habitat, inland saline water habitat, estuarine habitat, marine

10   habitat, wildlife habitat, preservation of biological habitats of special significance, rare, threatened or

11   endangered species migration of aquatic organisms, spawning, reproduction and/or early

12   development, and shellfish harvesting. (Basin Plan, 2.1.)

13        54.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin

14   Plan – including the Salinas River Basin - or deemed on a case-by-case basis, would be designated as

15   impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

16        55.    According to the 2016 303(d) List of Impaired Water Bodies, the Salinas River is listed

17   for Chlordane, Chloride, Chlorpyrifos, Chromium, DDD (Dichlorodiphenyldichloroethane), DDE

18   (Dichlorodiphenyldichloroethylene), DDT (Dichlorodiphenyltrichloroethane), Diazinon, Fecal

19   Coliform, Nitrate, Oxygen (Dissolved), PCBs (Polychlorinated biphenyls), pH,

20   Sedimentation/Siltation, Sodium, Toxicity, and Turbidity. Thus, the Receiving Waters for pollution

21   from the Facility are impaired, and the Defendants' illegal discharges of pollutants above the WQS

22   contributes to the continued impairment of the beneficial uses in the watershed.

23        56.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water

24   bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly

25   superseded by the Basin Plan. (65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.)

26

27

28

57.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[1]

58.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. (*See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000).)

59.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Section VI(A) of the Storm Water Permit.

### D.  The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

60.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.  (Storm Water Permit, Sections I(I) (Finding 54), X(B).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).)  The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. (Storm Water Permit, Section X(H).) The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. (Storm Water Permit, Section I(D) (Finding 32), Section X(C).)

61.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and

---

[1] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. (Storm Water Permit, Section X.)

62.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. (Storm Water Permit, Section X.)

63.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit.  (Storm Water Permit, Section X(A)(9).)  The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP.  (Storm Water Permit, Section XV.)

64.     The Storm Water Permit also requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. (Storm Water Permit, Section A(9)(d)(i)-(vi).) If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility

1  is not in compliance with the Storm Water Permit.  (*Id.*, Section A(9)(d).) The evaluation report shall

2  be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. (*Id.*)

3      65.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure

4  accuracy and effectiveness. (Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).) Significant

5  SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days.

6  (Storm Water Permit, Section X(B)(2).)  Dischargers are required to submit revisions to the SWPPP

7  that are determined to not be significant every three (3) months in the reporting year.[2] (*Id.* at Section

8  X(B)(3); Storm Water Permit, Fact Sheet, Section II (I)(1).)

9  **E.  The Storm Water Permit's Monitoring and Reporting Requirements**

10      66.    The Storm Water Permit requires facility operators to develop and implement a

11  Monitoring Implementation Plan ("MIP"). The MIP must ensure that storm water discharges are in

12  compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

13  specified in the Storm Water Permit. (*Id.* at Section B(2).) The MIP must ensure that practices at the

14  facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are

15  evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP.

16  (*Id.*)

17      67.    The objectives of the MIP are to ensure that BMPs have been adequately developed and

18  implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are

19  in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and

20  Receiving Water Limitations. (Storm Water Permit, Section XI.)

21      68.    The MIP aids in the implementation and revision of the SWPPP and measures the

22  effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. (*Id.*)

23      69.    The Storm Water Permit requires facility operators to monitor and sample storm water

24  discharges to ensure that the facility is complying with the terms of the permit. (Storm Water Permit,

25  Sections I(J) (Findings 55-56) and XI.)

26

27

28

---

[2] A reporting year under the Storm Water Permit is July 1 to June 30.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

70.     Section XI(A)(4) of the Storm Water Permit requires that the MIP be revised as necessary to ensure compliance with the Storm Water Permit.

71.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

72.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges.  (*See* Storm Water Permit, Section XI(A)(3).)  The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. (Storm Water Permit, Section X(B)(1).)

73.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged.  (Storm Water Permit Section XI(B)(4).)

74.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

75.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).  Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

76.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d)

1 listed impairments or approved TMDLs, and additional parameters required by the Regional Water
2 Board.

3     77.    Section XVI of the Storm Water Permit requires dischargers to submit an annual report
4 with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed
5 all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of
6 requirements within the reporting year, as indicated in the Compliance Checklist, an identification,
7 including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting
8 year, and the date(s) of the Annual Evaluation.

9     78.    Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1
10 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they
11 exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the
12 Storm Water Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL
13 for two consecutive two consecutive reporting years, for any required sampling and analysis
14 parameter under the Storm Water Permit The ERA Evaluation should identify additional BMPs and
15 SWPPP revisions needed to prevent future NAL exceedances and comply with the Storm Water
16 Permit.  Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later
17 than January 1, submit an ERA Report and certify that the ERA Report includes: 1) a summary of the
18 ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each
19 parameter that exceeded a NAL. Level 2 ERA report requirements are more stringent than a Level 1
20 ERA report.

21 **V.  <u>STATEMENT OF FACTS</u>**

22     **A.    The Facility Site Description**

23     79.    The Defendants operate an industrial facility located at 121 Spreckels Blvd. Spreckels,
24 CA 93962, and 1 Harris Rd., Salinas, CA 93908, which encompasses 150 acres, with 20 acres exposed
25 to storm water. The Facility's general purpose is farm equipment maintenance and fabrication,
26 warehousing and storage, seed storage/research, row crops, and farm laborer housing. The Facility
27 operates Monday through Friday, 8:00 AM to 5:00 PM from late November to mid-March, and
28 Monday through Sunday from mid-March to late November.

80.    The Facility's NOI states that Defendants operate the Facility under Standard Industrial Classification ("SIC") Code 0723, covering establishments engaged in crop preparation for market, 4231 covering motor transit and freight maintenance, 3499 covering miscellaneous metal manufacturing, 4225 covering warehousing, 0139 covering vegetable crops, and 5148 covering wholesale distribution of fruits and vegetables, and 9999 covering non-classifiable establishments.

81.    Under these SIC codes, the General Permit requires Spreckels to analyze storm water samples for particular parameters, including total suspended solids ("TSS"), oil & grease (O&G), pH, zinc ("Zn"), Nitrate plus Nitrite Nitrogen (N+N), iron ("Fe"), and aluminum ("Al"), though the 2016 Facility SWPPP wrongly states that the Facility is required to sample for TSS, O&G, pH, total organic carbon, temperature, and specific conductance.

82.    Facilities must sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. (Storm Water Permit, Section XI.B.6.).

83.    Plaintiffs are informed and believe, and thereon allege, that there are four main industrial areas at the Facility: the maintenance/fabrication yard and harvest shop, the cooling facility, the carton yard, and the seed storage and research area. Welding, steel cutting, vehicle repair, refueling, and oil changes occur at the maintenance/fabrication with pollutants including oil and grease, fuel, waste oil, and metal particulate. Pursuant to the Facility's 2018-2019 ERA Level 2 Technical Report, dirt is the primary source of TSS at the Facility. Crops are flash cooled at the cooling facility utilizing cooling lines adjacent to the building using refrigeration fluids with are drained weekly basis. The seed storage and research building is used to store and treat seeds and crops and grows test crops. Pollutants from this area include fungicides, fertilizers, and insecticides. And the unpaved carton storage yard is in the southeast portion of the facility.

84.    Plaintiffs are informed and believe, and thereon allege, that trucks enter the carton yard at the north end to collect pallets and load cartons, and then exit the yard at the southwest corner. Frequent traffic in the carton yard generates dust and particulates.

85.     Based on the industrial activities at the Facility, Plaintiffs are informed and believe, and thereon allege, pollutants at the Facility include oil and gas, petroleum hydrocarbons and particulates, dust and debris leading to sediment and TSS, sediment, copper, zinc and other metals from welding, repair, and vehicle brakes. Vehicle traffic and storage lead to track-on and track-off of these pollutants including dust and debris, both windblown and settled, which are later carried offsite via storm water flows and storm water discharge. Fluid leaks from vehicles, tire residue from traffic and storage, pollutant storage and transfer from tanks, pumps, fueling, and vehicle loading areas, and the industrial activities in the harvest shop are also potential sources of pollutants at the Facility.

86.     Plaintiffs are informed and believe, and thereon allege, that storm water at the Facility is initially flows to two catch basins, the first draining storm water runoff from most of the Facility including four of the five storm water drainage areas (with four discharge points identified in the Facility SWPPP as SP-1, SP-2, SP-3, and SP-5), the second accepting storm water runoff from the parking area and truck stop (with a single discharge point identified in the Facility SWPPP as SP-4).

87.     Plaintiffs are informed and believe, and thereon allege, that the drainage system for SP-1, SP-2, SP-3, and S-5, drains to a two-pond sewage system during the dry months of the year, and into the Salinas River during the wet months of the year. Switching between the sewage pond system and discharge to the Salinas River is completed by the manual operation of valves.

88.     Plaintiffs are informed and believe, and thereon allege, that storm water flowing from the from the discharge points and catch basins flows into the Salinas River which flows into Monterey Bay. Monterey Bay and the Salinas River are waters of the United States.

89.     Plaintiffs are informed and believe, and thereon allege, that each of the industrial activities, industrial areas, and industrial materials referenced herein impact and potentially impact stormwater and non-stormwater runoff and discharges at the Facility.

**B.     The Salinas River**

90.     The Salinas River is the longest river in the Central California Coast region draining over 4,000 square miles. The reach of the river pertinent for this action is located within Monterey County. Preservation of natural riparian habitat, and scenic values of the County's streams, creeks, and lakes carry significant importance for the inhabitants of the area.

91.     Monterey County is also home to certain critical habitat designations from the United States Fish and Wildlife Services ("USFWS"), including areas home to central California coast plants (including the Monterey Spineflower, the Robust Spineflower, the Scotts Valley Spineflower, and the Scotts Valley Polygonum), and endangered animals such as the California Tiger Salamander, the Tidewater Goby, the California Red-Legged Frog, the Conservancy Fairy Shrimp, the Olive Ridley Sea Turtle, and the Southern Sea Otter, among other flora and fauna. Over 70,000 acres within the County are designated as critical habitat by the USFWS.

92.     Pollutants from industrial activities, among other threats, can destroy or degrade aquatic habitat essential for breeding and rearing for the species listed in ¶ 90, and other species of concern known to inhabit Monterey County and that depend on surface water, including the Marbled Murrelet, California Clapper Rail, Santa Cruz Long-Toed Salamander, Blue-Nosed Leopard Lizard and Western Snowy Plover.

**C.     The Facility's Storm Water Permit Coverage**

93.     The Facility's NOI lists the Receiving Water as the Salinas River, which flows into the Pacific Ocean. The Salinas River is a water of the United States within the meaning of the CWA.

94.     The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number for the Facility as 3 27I014263. SMARTS lists the Facility coverage under the Storm Water Permit as "Active."

95.     Via search of the SMARTS database, Plaintiffs obtained a SWPPP for the Facility dated December 16, 2016 ("Facility SWPPP").

96.     Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

97.     Plaintiffs are informed and believe, and thereon allege, that Facility's Owners/Operators sampled storm water just once during each of the 2015-2016 and 2016-2017 reporting years, zero times during 2017-2018 reporting year, twice during the 2018-2019 reporting year, and once during the 2019-2020 reporting year in violation of Section XI.B. of the General Permit, despite ample storm

1   events in each of those years. No storm water sampling results are publicly available for the 2020-

2   2021 reporting year with the most recent submission to the State Board in July of 2020.

3       98.     Plaintiffs are informed and believe, and thereon allege, that pollutants associated with the

4   Facility include, but are not limited to TSS, O&G, pH, Al, Fe, Zn, and N+N and despite being required

5   by SIC code to sample and analyze for each of those pollutants, Defendants sample only for TSS,

6   O&G, pH, and total organic carbon.

7       99.     Plaintiffs are informed and believe, and thereon allege, that without properly identifying

8   all industrial activities or all significant materials at the Facility in the SWPPP, the Defendants have

9   not developed and/or implemented all appropriate BMPs.

10      100.    Plaintiffs are informed and believe, and thereon allege, that the Facility SWPPP failed to

11   identify, and the Defendants have failed to implement, the minimum BMPs required by the Storm

12   Water Permit, including: sufficient good housekeeping requirements; preventive maintenance

13   requirements; aerial deposition control; material handling and waste management requirements;

14   employee training and quality assurance; and record keeping.

15      101.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have further

16   failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its

17   storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs;

18   containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs

19   necessary to comply with the Storm Water Permit's effluent limitations. (Storm Water Permit,

20   Sections X.H.2.)

21      102.    Plaintiffs are informed and believe, and thereon allege, that Defendants have failed to

22   collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at

23   least February 3, 2016.

24      103.    Plaintiffs are informed and believe, and thereon allege, that violations of TSS, among other

25   constituents, occur each time storm water or non-storm water discharges from the Facility since at

26   least February 3, 2016, in violation of the Storm Water Permit, Discharge Prohibitions III.C and III.D,

27   Receiving Water Limitations VI.A, VI.B.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

104.    Plaintiffs are informed and believe, and thereon allege, that due to Defendants' recording averages of testing above the NAL for TSS during the 2015-2016 reporting year, the Facility entered ERA Level 1 during the 2015-2016 reporting year and moved to ERA Level 2 after the 2016-2017 reporting year. Of grave concern, in the 2018-2019 reporting year, Defendants reported TSS exceedances of 4570 mg/L, 1310 mg/L and 1120 mg/L, all three of which are multiples of the *instantaneous* NAL of 400 mg/L. In sum, over a three-year period, Defendants self-reported one instantaneous exceedance in the 2015-2016, three in 2018-2019 reporting year, and at least one in the 2019-2020 reporting year. Coastkeeper and The Otter Project believe that had the Owners/Operators collected sufficient storm water samples each reporting year for analysis, additional instantaneous NAL exceedances would have occurred.

105.    Plaintiffs are informed and believe, and thereon allege, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Defendants have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

106.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed and continue to fail to evaluate the effectiveness of the Facility BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in the Facility's storm water discharges. Further, Defendants have failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

107.    Plaintiffs are informed and believe, and thereon allege, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

108.    Plaintiffs are informed and believe, and thereon allege, that the Defendants' failure to properly address pollutant sources and pollutants themselves results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from the Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

109.     Plaintiffs are informed and believe, and thereon allege, that the Defendants' failure to properly address these pollutants and the pollutant sources results in the exposure of pollutants to precipitation, which carries these pollutants into the Receiving Waters.

### D.     Storm Water Discharges from the Facility

110.     Pursuant to the Facility SWPPP, there are five storm water drainage areas four of which are associated with discharge points SP-1, SP-2, SP-3, and SP-5 each flowing to a pond that eventually discharges to the Salinas River and into Monterey Bay. The fifth discharge point, SP-4 is associated with storm water runoff from the parking area and truck stop. The Salinas River and Monterey Bay are waters of the United States.

111.     Except as provided by the Permit, samples shall be collected from each drainage area at all discharge locations. The samples must be a) Representative of storm water associated with industrial activities and any commingled authorized non-storm water discharges; or b) Associated with the discharge of contained storm water.

### E.     The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

112.     Plaintiffs are informed and believe, and thereon allege, that pollutants from the Facility discharge into Salinas River, a traditionally navigable water.

113.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States.  (*See* 40 C.F.R. § 122.2.) The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21.)

114.     Plaintiffs are informed and believe, and thereon allege, that polluted storm water and non-storm water discharges from the Facility to the Receiving Waters.

115.     Storm water discharges containing pollutants, including but not limited to TSS, pH, and O&G, adversely affect the aquatic environment.

116.   Samples of storm water discharges collected at the Facility contain pollutants in excess of levels known to adversely impact aquatic species and the environment, in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations, federal regulations, WQS, and Benchmarks.

117.   Plaintiffs are informed and believe, and thereon allege, that during and/or after every significant rain event[3] or any other storm water or non-storm water discharge that has occurred at the Facility since February 3, 2016, through the present, Defendants have discharged and continue to discharge storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

**F.     Defendants' Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

118.   Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to develop an adequate MIP for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

119.   Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

120.   Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to collect or analyze any storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

121.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to sample storm water discharges from all discharge locations, in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

---

[3] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

122. Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections XI(B) and XI(C) of the Storm Water Permit.

123. Plaintiffs are informed and believe, and thereon allege, that the Defendants consistently fail to perform, or have performed on its behalf, visual observations of storm water during QSEs.

124. Plaintiffs are informed and believe, and thereon allege, that Defendants have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance.

125. Plaintiffs are informed and believe, and thereon allege, that the Defendants did not report its non-compliance as required.

126. Plaintiffs are informed and believe, and thereon allege, that the Defendants consistently failed, and continue to fail, to collect storm water samples during QSEs.

127. Information available to Plaintiffs also suggests that the BMPs proffered as implemented in the Facility's SWPPPs are insufficient and ineffective in reducing pollutants to levels compliant with the CWA.

128. Plaintiffs are informed and believe, and thereon allege, that the Defendants failed, and continue to fail, to submit adequate ERA Reports in recent reporting years to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the Storm Water Permit.

**VI. CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

129.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

130.    Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

131.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. (*See* Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).)

132.    The Defendants violate, and will continue to violate, the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

133.    Plaintiffs are informed and believe, and thereon allege, that the Defendants' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

134.    Each day since at least February 3, 2016 that the Defendants discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

135.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

136.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

137.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

138.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

139.     Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

140.     Plaintiffs are informed and believe, and thereon allege, that storm water containing levels of pollutants that cause or contribute to exceedances of WQS has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

141.     The Defendants violate, and will continue to violate, the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

142.     Plaintiffs are informed and believe, and thereon allege, that the Defendants' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

143.     Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

144.     By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 3, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

145.     An action for injunctive relief under the CWA is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm

1    Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have

2    no plain, speedy, or adequate remedy at law.

3    146.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

4    controversy exists as to the rights and other legal relations of the Parties.

5    **THIRD CAUSE OF ACTION**

6    **Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water**

7    **Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act**

8    **[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

9    147.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set

10    forth herein.

11    148.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed

12    and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water

13    Permit.

14    149.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed,

15    and continue to fail, to adequately implement the SWPPP for the Facility, in violation of the Storm

16    Water Permit.

17    150.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed,

18    and continue  to fail, to adequately revise the SWPPP for the Facility, in violation of the Storm Water

19    Permit.

20    151.    The Defendants have been in violation of the Storm Water Permit at the Facility every day

21    from February 3, 2016 to the present.

22    152.    The Defendants' violations of the Storm Water Permit and the CWA at the Facility are

23    ongoing and continuous.

24    153.    The Defendants will continue to be in violation of the Storm Water Permit and the CWA

25    each and every day the Defendants fails to adequately develop, implement, and/or revise the SWPPP

26    for the Facility.

27    154.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility

28    is a separate and distinct violation of the CWA.

155.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 3, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

156.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

157.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**<u>FOURTH CAUSE OF ACTION</u>**

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the Storm Water Permit and the Clean Water Act**

**[U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

158.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

159.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

160.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

161.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

162.    The Defendants have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from February 3, 2016, to the present.

163.    The Defendants' violations of their Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

164.    The Defendants will continue to be in violation of Section XI of the Storm Water Permit, and the CWA, each and every day it fails to adequately develop, implement, and/or revise an MIP for the Facility.

165.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

166.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 3, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

168.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FIFTH CAUSE OF ACTION**

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)]**

169.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

170.    Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to sufficiently sample and analyze storm water in violation of Section XI(B)(2) and (B)(6) of the Storm Water Permit

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

171.     Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

172.     Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to submit adequate ERA Reports to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the Storm Water Permit.

173.     Plaintiffs are informed and believe, and thereon allege, that the Defendants' Annual Reports failed, and continue to fail, to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the Storm Water Permit.

174.     Plaintiffs are informed and believe, and thereon allege, that the Defendants have failed, and continue to fail, to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

175.     The Defendants have been in violation of Sections XI, XII and XVI of the Storm Water Permit since February 3, 2016.

176.     The Defendants have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Sections XI, XII(C) and XVI of the Storm Water Permit.

177.     The Defendants have been in violation of Sections XI, XII(C) and XVI of the Storm Water Permit since at least February 3, 2016.

178.     The Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

179.     By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 3, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

180.     An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would

1   irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which

2   harm they have no plain, speedy, or adequate remedy at law.

3       181.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

4   controversy exists as to the rights and other legal relations of the Parties.

5   **VII.   <u>RELIEF REQUESTED</u>**

6       WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

7       a.      A Court Order declaring Defendants to have violated and to be in violation of Sections

8   301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) for its unlawful

9   discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p)

10  of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include

11  BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements

12  of the Storm Water Permit and the CWA.

13      b.      A Court Order enjoining Defendants from violating the substantive and procedural

14  requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C.

15  §§ 1311(a), 1342;

16      c.      A Court Order assessing civil monetary penalties for each violation of the CWA

17  occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. §

18  1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

19      d.      A Court Order assessing civil monetary penalties for each violation of the CWA at

20  $37,500.00 per violation per day, pursuant to Sections 309(d) and 505 of the CWA occurring after

21  December 6, 2013 through November 2, 2015, and $55,800 per day per violation for all violations

22  that occurred after November 2, 2015 and were assessed on or after January 13, 2020.  (See 33 U.S.C.

23  §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.)

24      e.      A Court Order awarding Plaintiffs their reasonable costs of suit, including attorney,

25  witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C.

26  § 1365(d); and

27      f.      Any other relief as this Court may deem appropriate.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1    Dated: 4/7/2021                        AQUA TERRA AERIS LAW GROUP

2                                      By:        /s/Anthony M. Barnes
3                                           Anthony M. Barnes
                                            Attorney for Plaintiffs CALIFORNIA
4                                           COASTKEEPER, INC., dba
                                            CALIFORNIA COASTKEEPER ALLIANCE,
5                                           and THE OTTER PROJECT, INC., and
                                            MONTEREY COASTKEEPER.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES